# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LAWRENCE E. SCIBLE,

        Plaintiff,

v.                                   Civil Action No. 1:05cv166
                                   (Judge Keeley)

MIKE MILLER, JAY ROBBINS,
WILLIAM HAINES, JIM RUBENSTEIN,
DIVISION OF CORRECTIONS, NATIONAL
UNION FIRE INSURANCE COMPANY OF PA,

        Defendants.

## OPINION/REPORT AND RECOMMENDATION

On December 23, 2005, *pro se* plaintiff initiated this case by filing a civil rights complaint against the above-named defendants pursuant to 42 U.S.C. § 1983, the Federal Tort Claims Act ["FTCA"], and the Religious Land Use and Institutional Persons Act ["RLUIPA"], 42 U.S.C. § 2000cc. On March 15, 2006, Plaintiff's claims under the FTCA were dismissed. Subsequently, on July 25, 2006, National Union was dismissed as a defendant in this action and Plaintiff's claims for injunctive relief were denied. This case is currently before the undersigned for a Report and Recommendation on Defendant Miller, Robbins, Haines, Rubenstein and the Division of Corrections' ("DOC or WVDOC") motion to dismiss the complaint.

## I. Factual and Procedural History

### A. The Complaint

In the complaint, Plaintiff asserts that the Defendants placed him in a cell with a dangerous inmate. Plaintiff verbally complained that he was being sexually harassed by his cell mate and feared he would be sexually assaulted. Defendants Miller and Robbins advised Plaintiff that prison

rape was a part of prison life and refused to remove him from the cell. As a result, Plaintiff filed a written grievance requesting he be moved from his cell for fear of violence. Defendant Miller moved Plaintiff to another cell that same day. However, Plaintiff was issued a disciplinary report for allegedly making threats against Defendant Miller in the grievance.[1] Plaintiff was found guilty of the charge and was sentenced to 30 days segregation (suspended), 90 days probation, and 30 days loss of privileges. Plaintiff appealed the guilty finding, but was denied relief.

Also in the complaint, Plaintiff asserts that he is of the Rastafarian faith and that he has taken the vow of the Nazarite. Pursuant to his religious beliefs, Plaintiff requested an exemption from the Division of Correction's grooming policy, a religious diet, and assistance in finding a Rastafarian leader and/or literature so that he may appropriately practice his faith. Plaintiff filed his request with Defendant Haines. Defendant Haines informed Plaintiff that in order to change his religion, he must file the appropriate paperwork with the Chaplain. Moreover, Defendant Haines informed Plaintiff that he would be required to abide by the grooming policy.

Unsatisfied with this response, Plaintiff appealed to Defendant Rubenstein, the Commissioner of the WVDOC. Upon review of the complaint, Commissioner Rubenstein remanded the issue back to Defendant Haines for a determination of whether Plaintiffs' religious beliefs were sincerely held, whether there is a compelling interest with respect to the grooming policy, and whether there are less restrictive ways in which Plaintiff's religious beliefs can be accommodated. On remand, Defendant Haines found that Plaintiff's religious beliefs were not sincerely held, that there are several compelling reasons for enforcing the policy and that there are no less restrictive means to enforce the policy. Despite Plaintiffs' objections to Defendant Haines' findings, Plaintiffs'

---

[1] In the grievance, plaintiff stated that "This G-1 puts <u>you</u> on notice."

request for exemption was denied by Commissioner Rubenstein.

After some clarification,[2] the undersigned has determined and construes the complaint to assert the following grounds for relief:

(1) the Defendants were deliberately indifferent to a serious threat against Plaintiffs' person;

(2) Plaintiffs' disciplinary report was retaliatory and false;

(3) the regulation allowing Plaintiff to be disciplined for language in a written grievance is unconstitutional on its face because it violates his First Amendment right to free speech;

(4) the finding of guilt was erroneous and not supported by the facts;

(5) the finding of guilt violated Plaintiffs' First and Sixth Amendment rights of access to the courts, free speech and to seek redress;

(6) the Defendants violated Plaintiffs' First Amendment right to freely practice his religion; and,

(7) the actions of the Defendants violated the RLUIPA.

## B. **The Defendants' Answer**[3]

In their motion to dismiss, the Defendants assert, generally, that the complaint should be dismissed because:

(1) Plaintiff has not exhausted his administrative remedies;[4]

---

[2] See dckt. 55 at 4.

[3] Because National Union has been dismissed as a defendant in this action, "the Defendants" refers collectively to Mike Miller, Jay Robbins, William Haines, Jim Rubenstein and the DOC.

[4] In the complaint, Plaintiff asserts that his administrative remedies are exhausted and attaches copies of the remedies he filed with regard to the matters raised in the complaint and the responses thereto. In the Defendants' Motion to Dismiss, although they assert that Plaintiff's claims are not exhausted, they do not develop that argument in the body of their motion, nor explain the reasons why they believe that Plaintiff has failed to exhaust. Because the exhaustion of administrative remedies is a

(2) Plaintiff fails to state an Eighth Amendment claim and/or the Defendants are entitled to qualified immunity;

(3) Plaintiff makes no claim of physical injury under 42 U.S.C. § 1997e(e);

(4) the WVDOC's policy pertaining to inmate grooming is reasonably related to compelling governmental and penological interests; and

(5) the Defendants are entitled to absolute immunity.

In addition, in the memorandum in support of their motion, the Defendants also assert that true threats are not protected speech under the First Amendment. Therefore, Plaintiffs' First Amendment challenge to the policy which allows him to be disciplined for speech in a written grievance should be denied.

## C.  Plaintiffs' Reply

In response to the motion to dismiss filed by Defendants, Plaintiff argues that his claims should not be dismissed for failure to exhaust because he clearly provided the Court with documentation showing that he exhausted all three levels of the DOC's administrative remedy process. Second, Plaintiff asserts that he is not required to make a showing of physical injury under 42 U.S.C. § 1997e(e) because the Eighth Amendment also protects him against future harm. Third, Plaintiff argues that punishing an inmate for language in a written grievance, even if hostile, sexual, abusive or threatening, is a violation of free speech and restricts his right of access to the courts. Fourth, Plaintiff argues that he has made a showing that the Defendants violated his right to freely practice his religion. Fifth, Plaintiff argues that the Defendants failed to address whether his rights

---

defense that the *defendants* must affirmatively plead, and considering that the Defendants have failed to provide any proof whatsoever that Plaintiff has failed to exhaust his administrative remedies, the undersigned will not consider this argument in more detail.

under the RLUIPA were violated and that failure should be taken as an admission and his complaint should not be dismissed. And, finally, Plaintiff argues that the Defendants are not entitled to absolute immunity because he has sued them in both their individual capacities for monetary damages and in their official capacities only to the extent that he seeks injunctive relief.

**D.  The Defendants' Response**

In response to the Plaintiff's reply to their motion, the Defendants assert that the cases cited by Plaintiff to show that he is not required to show a physical injury are distinguishable from the instant case because the threat of sexual assault was removed by the Defendants when they transferred him to another cell. Additionally, the Defendants reargue their claim that true threats are not protected speech under the First Amendment, that they have not violated Plaintiffs' First Amendment right to freely practice his religion and that they are entitled to qualified immunity because Plaintiff has sued them in their official capacities.

**E.  The Petitioner's Reply**

First, Plaintiff argues that he is not required to make a showing of physical injury to obtain nominal damages. Although Plaintiff concedes that he did not make a request for nominal damages in the complaint, he asserts that "[i]n keeping with the principle that pro se complaints be construed liberally . . . the Plaintiff's complaint should be read as having requested nominal damages." Second, Plaintiff asserts that only criminal threats are not protected speech under the First Amendment and that his statement that "This G-1 puts <u>you</u> on notice" cannot in any way be considered a criminal threat, especially when read within the context of the entire grievance. Moreover, Plaintiff asserts that the Defendants argument that placing someone on notice in a correctional environment is a threat of physical violence is absurd.

Third, Plaintiff argues that growing a beard and dreadlocks is the only available way to practice his religious beliefs. Plaintiff asserts that there are three central tenets to Rastafarism. Those tenets are: 1) smoking ganga, which is unavailable to Plaintiff for obvious reasons; 2) receiving an "I-TAL" diet, which the Defendants cannot provide; and 3) living in a natural environment, which is not attainable in a correctional facility. Plaintiff also asserts that the Defendants security concerns are nonexistent in his case because he has no chance of escape, he has no ability to smuggle in contraband and by the time he is able to grow his hair long enough so as to alter his appearance, he will be discharged from custody. Plaintiff also notes that he has offered to comprise and wear his hair loosely instead of in dreadlocks and that he would wear a goatee instead of a full beard. Plaintiff further argues that the Regional Jail facilities do not have grooming restrictions. Plaintiff next argues that concerns over gangs is also a nonissue because there are no gangs in the WVDOC.

Finally, with respect to Defendant's claim of absolute immunity, Plaintiff asserts that he has sued the Defendants in their official capacities only to the extent that he seeks injunctive and declaratory judgment. As to his other claims, Plaintiff asserts that the Defendants have been sued in their individual capacities for monetary damages. Therefore, Plaintiff argues that the Defendants are not entitled to absolute immunity.[5]

## F. The Defendants Submission of Affidavits

On June 22, 2006, at the direction of the Court, Defendants Miller, Robbins and Haines filed affidavits in support of the claims made in the motion to dismiss.

---

[5] The undersigned agrees that Plaintiff has sued the Defendants in their official capacities as his complaint relates to claims for injunctive and declaratory relief and in their individual capacities as the complaint relates to his claims for monetary damages. See Haines v. Kerner, 404 U.S. 519, 520 (1972). Thus, the Defendants are not entitled to absolute immunity.

### 1.  William Haines

In his affidavit, Defendant Haines asserts that he is currently the Warden at the Huttonsville Correctional Center.  Warden Haines further avers that the inmate grooming policy at his facility is in effect to promote safety, security, identification, and hygiene.  Warden Haines asserts that it is within his personal knowledge and expertise that granting the Plaintiff's request for religious accommodation would seriously compromise the facility's ability to administer rehabilitative programs.  Warden Haines asserts that in his experience, it is harder to conduct searches on inmates with long hair, it is easier for inmates to conceal contraband in long hair, and that the grooming policy promotes good hygiene and allows for quick identification of inmates.  Warden Haines also avers that the grooming policy promotes inmate safety because if an altercation would happen to occur, inmates cannot be pulled by the hair, dragged by the hair, or otherwise caused pain by the pulling of hair.  Warden Haines asserts that the facility has made other methods of religious practice available to inmates, such as special religious diets.

### 2.  Jay Robbins

Defendant Robbins avers that he is currently a Correctional Counselor with the WVDOC and that he has been employed by the Department for seven years.  In his experience, putting someone on notice in a correctional facility is a threat of physical violence.  Therefore, when he was told by Plaintiff that physical violence was likely if Plaintiff was not removed from his cell, and then received a grievance from Plaintiff in which Plaintiff stated that he was "put on notice," Defendant Robbins perceived Plaintiff's written notice as a threat of violence.  Defendant Robbins believed this to be a threat, in part, because in the past, he has witnessed staff members being put on notice by inmates and later being attacked.  Thus, Defendant Robbins asserts that he felt threatened by the

language in Plaintiff's grievance and felt it was important to act in order to avoid physical violence.

With regard to the grooming policy, Defendant Robbins avers that he has personally witnessed incidents where inmates have tried to hide weapons and illegal drugs in their hair or in pockets of skin under their hair. Defendant Robbins asserts that allowing inmates to have long hair and beards would hamper his ability to search for and detect these items. Moreover, Defendant Robbins asserts that long hair and facial hair are unhygienic because he has seen them used to cover contagious skin conditions, sores, and wounds. In addition, long hair and beards promote lice, an ongoing health concern at the Huttonsville Center. Finally, Defendant Robbins asserts that long hair and beards hamper the quick and accurate identification of inmates that is essential to the safety and security of the institution.

### 3. Mike Miller

Defendant Miller avers that he is currently employed as a Unit Manager for the WVDOC and that he has been employed by the Department for more than seventeen years. On July 24, 2005, he received a grievance from the Plaintiff on which it stated "This G-1 puts you on notice." Defendant Miller asserts that after hearing Plaintiff tell Jay Robbins that physical violence would occur if he was not removed from his cell, Defendant Miller believed that the language in the grievance was a threat of physical violence. Therefore, based on this belief, Defendant Miller states that he prepared a violation report.

With regard to the grooming policy, Defendant Miller states that he has personally witnessed incidents where inmates have tried to hide weapons and illegal drugs in their hair and facial hair. Defendant Miller asserts that the DOC's grooming policy makes it easier to search inmates to detect such contraband. Moreover, Defendant Miller has witnessed altercations between inmates in which

one of the inmates has been grabbed or pulled by the hair causing pain.  In one instance, an inmate was grabbed by the hair, had his neck and head pulled back in order for the other inmate to punch his face.  Additionally, Defendant Miller avers that quickly and accurately identifying inmates is essential to the safety and security of the institution and that the grooming policy promotes such concerns.

## G.  Plaintiff's Brief in Support of Religious Literature

In his brief, Plaintiff asserts that he has requested literature of the Rastafarian faith be provided to him according to Policy Directive 510.00.  However, the Defendants have failed to provide Plaintiff with the requested literature.  Although Plaintiff concedes that the policy does not actually state who will fund the cost of providing religious literature, Plaintiff would like the Court to infer that the Defendants bear such costs because he is indigent and dependent upon the Defendants for his religious needs.

Plaintiff also argues that he believes that the Defendants are appropriated thousands of dollars a year to fund religious services for the inmate population and that the Defendants provided religious literature and other materials to the Christian and Muslim inmates upon their request. Further, Plaintiff believes that the Defendants spend additional funds on other activities related to the Christian and Muslim faiths.  Thus, Plaintiff seeks an Order directing the Defendants to provide him with religious materials at no cost.

## H.  Plaintiff's Response to the Defendant's Affidavits

In his response to the Defendants' affidavits, Plaintiff first asserts that the affidavits are not sworn and should be stricken.[6]  Next, Plaintiff asserts that the Defendants affidavits are unsupported

---

[6] The Court rejects this argument.  A review of the affidavits shows that the Defendants swore under penalty of perjury that the content of the affidavits is true and correct.  Moreover, the affidavits are

and cannot be proven true. Third, Plaintiff asserts that certain statements made in the Defendants' affidavits are not true and that the Defendants are merely trying to "hoodwink" the Court. Fourth, Plaintiff asserts that the reasons given by the Defendants for the grooming policy are without merit and that the grooming policy is not being used to promote security and hygiene issues. In support of this claim, Petitioner attaches an affidavit signed by himself and thirty-six other inmates stating that it is their experience that the purpose of the grooming policy is to promote degradation of the inmate population and that the grooming policy actually promotes unhygienic conditions.[7] Fifth, Plaintiff asserts that if the facility is so concerned about contraband, the grooming policy should be imposed on staff as well as the inmates as staff has an even greater opportunity to smuggle contraband. Sixth, Plaintiff concedes that altercations do occur between the inmates and that hair may be pulled causing pain. However, Plaintiff asserts that altercations and hair pulling can occur in any environment and hair pulling alone is not enough to impose a ban on long hair. In fact, Plaintiff argues that even cut to three inches as the grooming policy allows, an inmate may still have his hair pulled. Seventh, Plaintiff asserts that not having a grooming policy would actually benefit the institution's ability to identify inmates. In support of this claim, Plaintiff asserts that the institution could keep records of how a prisoner looks with and without hair, thereby aiding identification if a prisoner attempts to alter his appearance. Finally, Plaintiff argues that the Defendants affidavits do not provide any evidence that the DOC uses the least restrictive means to

---

notarized by a Notary Public who appears to be duly commissioned to accept such oaths in the State of West Virginia.

[7] Plaintiff makes a special point to note that there is 200 years combined correctional experience between himself and the other inmates who signed the affidavit. Apparently, this is Plaintiff's attempt to counter the over thirty years of combined correctional experience that Defendants Miller, Robbins and Haines possess. However, as noted by the Defendants in their motion to strike this document, such a statistic is irrelevant. The Court is not required to give deference to the "expertise" of an inmate.

accomplish their compelling interest, although he does not state what other means the WVDOC could employ. Thus, Plaintiff asserts that the Court should not give deference to the prison officials based on their affidavits.

## I. **Brief in Support of Religious Diet**

In this brief, Plaintiff asserts that he has requested that he be served an "I-tal" vegetarian diet in conformance with his religious beliefs and that such request was denied. Plaintiff asserts that an "I-tal" diet consists of food grown organically without the use of pesticides or man-made chemical fertilizers. As an alternative, Plaintiff asserts that he sought a regular vegetarian diet in substitution for the preferred "I-tal" diet. However, although Plaintiff was granted a vegetarian diet, Plaintiff asserts that the diet served to him was nutritionally inadequate and insufficient causing him to lose three pounds and to show signs of scurvy. Thus, Plaintiff requested that his vegetarian diet be supplemented with a variety of fruits, grains and vegetables. Plaintiffs' request was denied.

Plaintiff also requested that his vegetarian diet consist of a variety of entrees instead of the same food being served over and over again. Plaintiff asserts that Christian and Muslim prisoners receive over thirty different entrees, whereas Plaintiff's diet received only two, peanut butter and beans. Plaintiff asserts that he was told that his diet would be improved, but that such improvement never occurred. Therefore, Plaintiff requested that he be taken off the vegetarian diet.

## J. **Defendants Reply to Petitioner's Response to their Submission of Affidavits**

In this document, the Defendants assert that Plaintiff's suggestion that their affidavits are not properly sworn is mistaken. The Defendants assert that each affidavit is properly sworn and notarized by a notary public. Moreover, the Defendants assert that Plaintiff's response to their affidavits should be stricken because the Court did not give Plaintiff permission to respond to such

documents and that a response to affidavits is inappropriate. Next, the Defendants argue that their affidavits are based on their correctional experience, education, training and first hand knowledge and that there is no comparison between that type of experience and the experience of convicted felons living in a correctional facility. Finally, the Defendants assert that Plaintiff's filings are frivolous and merely for the purpose of harassing the Defendants. In fact, the Defendants assert that Plaintiff's unsubstantiated attacks on their honesty and integrity should be sanctioned.

**K.  Defendants Response to Plaintiff's Brief in Support of Religious Literature**

In this response, the Defendants first assert that Plaintiff did not complain about being denied religious literature in his complaint and that his brief should be stricken because he is attempting to amend his complaint without permission from the court.[8]  In addition, the Defendants assert that Plaintiff's complaint is not that he has been denied religious literature, in fact, the Defendants assert that Plaintiff has been approved to receive the requested materials. Instead, the Defendants assert that Plaintiff's claim merely involves who should pay for the requested materials. In this case, the Defendants assert that the DOC is not required to expend State funds to purchase religious materials and that the DOC does not purchase religious books for any religion. The Defendants assert that most materials are donated to a particular inmate or to the penitentiary by various religious groups. Were the Defendants to purchase religious materials for the Plaintiff, they argue that they would be improperly aiding in religion, a violation of the establishment clause.

**L.  The Defendants' Response to Plaintiff's Brief in Support of Religious Diet**

---

[8] In the Order granting National Union's motion to dismiss and denying Plaintiff's request for injunctive relief, the District Judge found that this argument was without merit. See dckt. 69 at 3, n. 1. Specifically, the District Judge determined that in paragraph 28 of the complaint, Plaintiff alleges that the Defendants violated his First and Fourteenth Amendment rights to freely practice his religious beliefs by prohibiting him from growing dreadlocks and refusing to provide him with a religious diet or religious literature. Id. Therefore, this argument will not be addressed further.

In this response, the Defendants first assert that Plaintiff did not complain about being denied a religious diet in his complaint and that his brief should be stricken because he is attempting to amend his complaint without permission from the court.[9]  In addition, the Defendants assert that Plaintiff is not complaining that he is being denied a vegetarian diet, only that he does not have an adequate selection of entrees and that the vegetarian diet served to him is nutritionally inadequate. Moreover, the Defendants assert that Plaintiff's complaints of health problems as a result of the diet he is currently being served are unfounded.  Plaintiff states that he has lost three pounds and that he may show signs of scurvy.  However, the Defendants argue that the loss of three pounds is not an immediate health threat and that Plaintiff does not show signs of scurvy.

Furthermore, the Defendants assert that inmates are warned that a total vegetarian diet is not nutritionally adequate and that their entrees should be supplemented with foods from the self serve area at meal times.  The self serve area provides items like oatmeal for breakfast and a salad bar for lunch and dinner.  Therefore, Plaintiff is able to supplement his vegetarian diet to make it nutritionally adequate.  Moreover, the Defendants' assert that inmates on the vegetarian diet are also advised that a daily vitamin/mineral supplement and a calcium tablet are recommended, yet Plaintiff has not requested such items from medical.

## M.  The Defendants Submission of Additional Affidavits

On September 20, 2006, the Defendants submitted additional affidavits and documentation pertaining to Plaintiff's request for religious material and a religious diet.

### 1.  Affidavit of Chaplain Randy Brake

In his affidavit, Chaplain Brake asserts that he is currently employed as a Chaplain with the

---

[9] See note 6 infra.

WVDOC. Chaplain Brake avers that on May 1, 2006, he received a request from Plaintiff for four books pertaining to the Rastafarian faith. On May 16, 2006, Chaplain Brake notified Plaintiff that his request to obtain such books was approved, but that the materials would have to be reviewed by security prior to being allowed into Plaintiff's personal property. Chaplain Brake avers that he even contacted One Love Press which agreed to donate one of the books, "The Rasta Heart," to Plaintiff. The Chaplain believes that Plaintiff received this book on April 17, 2006. However, Chaplain Brake then avers that religious materials are not purchased for inmates using State funds. More specifically, Chaplain Brake asserts that Bibles are not purchased for Christian inmates, Korans are not purchased for Muslim inmates, and similar materials are not purchased for other religions. Chaplain Brake avers that Plaintiff has not been denied religious materials.

As to Plaintiff's claim regarding his diet, Chaplain Brake asserts that Plaintiff was provided a vegetarian diet pursuant to his religious request. Chaplain Brake avers that all inmates, including those on a vegetarian diet, have access to the self serve area where they may supplement their entrees. In addition, Chaplain Brake asserts that vitamins and other nutritional aids are available at the inmate store to supplement an inmate's dietary needs. Chaplain Brake also confirms that Plaintiff has requested to be taken off of the vegetarian diet and that his request was approved. Therefore, by his own choosing, Plaintiff is no longer on a vegetarian diet.

**N. The Defendants' Response to Plaintiff's Letter of September 22, 2006**

In this response, the Defendants assert that they are replying to the Plaintiff's letter of September 22, 2006. However, there is nothing on the docket to show that the Court ever received such letter or that such letter was made a part of the record in this case. Nevertheless, the Court can ascertain the general contents of the Plaintiff's letter from the Defendants' response.

14

In their response, the Defendants first assert that Plaintiff's complaint that he does not have the funds to purchase his own religious materials or his complaint that his food selection is boring, do not rise to the level of a constitutional violation. In fact, the Defendants assert that such claims are frivolous and should be dismissed. Next, the Defendants assert that although Plaintiff complains that his vegetarian diet is not nutritionally adequate for sustained usage, Plaintiff has failed to address the fact that his core diet may be supplemented through the use of the self serve bar and nutritional supplements. Moreover, the Defendants assert that to the extent that Plaintiff now complains that his meals are not prepared in accordance with his faith, those claims have not been previously raised and are unexhausted. Third, the Defendants argue that although Plaintiff complains that religious materials are purchased for other faiths, such a claim is untrue and unfounded as Chaplain Brake noted in his affidavit. Fourth, the Defendants argue that Plaintiff's complaints about Chaplain Brake are misleading. In support of this argument, the Defendants assert that Chaplain Brake is employed as a spiritual leader and his employment is not related to any particular religion. Moreover, the Defendants assert that Chaplain Brake's job is merely to insure that the spiritual needs of the inmates are met and not to preach the Christian faith. The Defendants argue that other clergy members are not denied access to the penitentiary to provide services, and in particular, a Rastafari leader has never been denied access. Finally, the Defendants assert that no matter what version of Policy Directive 510.00 is submitted, there is nothing in any version of the policy that provides for using State funds to purchase religious material for inmates.

## II. Standard of Review

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations. Advanced Health-Care Services, Inc., v. Radford Community

Hosp., 910 F.2d 139, 143 (4th Cir. 1990). Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). When a motion filed pursuant to Rule 12(b)(6) contains matters outside the pleadings, the motion will be construed as one for summary judgment and will disposed of as provided under Rule 56. See Fed.R.Civ.P. 12(b).

Summary judgment is appropriate "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(c). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party is required "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. at 322.

When a moving party supports its Rule 56 motion with affidavits and other materials, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Proc. 56(e). Conclusory and self-serving affidavits are not sufficient. Id. Only disputes of material fact preclude summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Electric

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted).

## III.  Analysis

### A.  Ground One

In ground one, Plaintiff asserts that the Defendants were deliberately indifferent to a serious threat against his person.  In support of this claim, Plaintiff asserts that sometime between July 15 and 21, 2005, he verbally advised Defendants Miller and Robbins that he was having problems with his cell mate.  Plaintiff complained that he was being sexually harassed and feared being raped.  At the time, Plaintiff asserts that he was 5'4" in height and weighed approximately 130 pounds.  His cell mate was 6'4" and weighed approximately 230 pounds.  In addition, although Plaintiff was a nonviolent offender, he asserts that his cell mate had an extensive criminal history which included violent offenses.  In response to Plaintiff's verbal complaint, Defendants Miller and Robbins advised Plaintiff that prison rape was a part of prison life and refused to move him.  On or about July 21, 2005, Plaintiff filed a written request to Defendant Miller seeking to be moved to another cell because of his fear of being attacked by his cell mate.  Plaintiff was moved that same day.

In the Defendants motion to dismiss, the Defendants assert that because Plaintiff has failed to make a showing of physical injury as required by 42 U.S.C. § 1997e(e) his claim that the Defendants were deliberately indifferent to a serious threat of violence against him must fail.[10]  More specifically, the Defendants assert that even assuming all the facts in the complaint as true, it is clear that Plaintiff was promptly moved when he expressed a fear of rape and that the move was successful as Plaintiff was never injured.

---

[10] Section 1997e(e) states that "no federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injuries suffered while in custody without a prior showing of physical injury."

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. n3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837.

Assuming the facts as stated by Plaintiff are true, Plaintiff verbally requested to be moved from his cell because he feared that he would be raped by his cell mate. Plaintiffs' verbal request was denied. Thereafter, Plaintiff filed a written request to be moved from his cell based on his fear of violence. That request was granted and Plaintiff was removed from his cell the same day the written request was made. This entire sequence of events occurred in no more than six days and Plaintiff was not injured.[11] The Defendants acted swiftly and the threat of violence never materialized. Accordingly, Plaintiff has failed to show that the Defendants were deliberately

---

[11] Plaintiff cannot pinpoint the date on which he made the verbal request or the written request. He merely states that the verbal request was made sometime between July 15th and July 21st. Moreover, Plaintiff approximates that the written request was made on July 21st. Therefore, the sequence of events occurred in no more than a six day period, but most likely, much less.

indifferent to a serious threat against him and ground one should be dismissed.[12]

## B. __Ground Two__

In ground two, Plaintiff asserts that the disciplinary report issued against him for threats was in retaliation for Plaintiff's filing grievances concerning his fear of being raped. However, the Fourth Circuit has found that inmates do not have a constitutional right to participate in grievance procedures. Adams v. Rice, 40 F.3d 72, 75 (4th Cir.1994). Thus, Plaintiff cannot sustain a claim of retaliation based solely on the filing of grievances. Id. (in order to sustain a claim based on retaliation, Plaintiff must allege that the retaliatory act was taken in response to the exercise of a constitutionally protected right). Moreover, "in forma pauperis plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B) ]." Id. In this case, Plaintiff merely makes naked conclusory allegations of reprisal. Accordingly, Plaintiff has failed to state a claim for retaliation and ground two is due to be dismissed.

## C. __Ground Three__

In ground three, Plaintiff asserts that the regulation allowing him to be disciplined for language in a written grievance is unconstitutional on its face because it violates his First Amendment Right to free speech. In support of this claim, Plaintiff asserts that on the grievance filed with Defendant Miller on July 21, 2005, he stated that "This G-1 puts you on notice." Plaintiff states that his intent in writing this was to put the Defendants on notice that if something happened

---

[12] Although Plaintiff argues a threat of future harm, he has failed to substantiate such a claim. Plaintiff asserts only that he feared being raped by his cell mate. Because the Defendants removed him from the presence of that inmate, the threat of future harm from that inmate was eliminated. The fact that Plaintiff was moved to another unit which allegedly contained violent inmates is inapposite. Unlike his specific fear of rape with his cell mate, any perceived threat in his new unit was merely speculative.

to him because they would not move him to another cell, they would be liable in a court of law. However, based on the incidents surrounding the grievance, and their experience as corrections officers, the Defendants reasonably believed Plaintiff was threatening them with physical violence. In support of their claims, the Defendants assert that in their experience as corrections officers, putting someone on notice in a correctional facility is tantamount to a threat. In fact, Defendant Robbins has seen coworkers "put on notice" and then later assaulted. Accordingly, the Defendants acted in response to a perceived threat and filed a disciplinary report against Plaintiff based on that threat.

In support of his claim, Plaintiff cites the case of <u>Bradley v. Hall</u>, 64 F.3d 1276 (9th Cir. 1995). In <u>Bradley</u>, the Plaintiff sued the director of the Oregon Department of Corrections ("ODOC") for punishing him for the use of hostile, sexual, abusive or threatening language in a grievance.[13] Specifically, Bradley argued that subjecting him to discipline for the use of disrespectful language in a grievance violated his right to petition for redress of grievances, and therefore, rendered the regulation permitting such conduct unconstitutional. In examining the constitutionality of the regulation, the Ninth Circuit noted that it has been clearly established for some time that prisoners have a constitutional right to access the courts. <u>Bradley</u>, 64 F.3d at 1279 (citing <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977)). The Court also noted that "[a] prisoner's right to meaningful access to the courts, along with his broader right to petition the government for redress of his grievances under the First Amendment, precludes prison authorities from penalizing

---

[13] When a prison guard failed to retrieve Bradley for his law-library call-out, Bradley filed a grievance in which he stated: "Her [the guard's] actions shows her misuse of her authority and her psychological disorder needs attention. Then you wonder why things happen like that guard getting beat down? I suggest you talk to this woman and have her act professionally instead of like a child. [sic]" <u>Bradley</u>, 64 F.3d at 1278.

a prisoner for exercising those rights." Id. Moreover, because prisoners are required to exhaust administrative remedies prior to seeking relief in federal court, the Ninth Circuit found that a prisoner's "fundamental right of access to the courts hinges on his ability to access the prison grievance system." Id.

In finding the regulation unconstitutional, the Court was not persuaded by the director's argument that "punishing a prisoner for the content of his grievance does not burden his ability to file a grievance." Id. Rather, the Court found that "[f]rom the prisoner's point of view, the chilling effect is the same. Whether the content of the grievance or the act of filing the grievance is deemed to be the actus reus of the offense, the prisoner risks punishment for exercising the right to complain. Without question, the application of the ODOC['s] disrespect regulations to Bradley's written grievance impacts his constitutionally protected rights under the Fourteenth and First Amendments." Id. Thus, further analyzing the regulation under the standards set forth in Turner v. Safly, 482 U.S. 78, 79 (1987),[14] the Ninth Circuit found that the ODOC's disrespect rule was valid on its face because it serves several legitimate penological interests. Bradley, 64 F.3d at 1280. However, the Court also found that a prisoner's constitutional right of meaningful access to the courts was fundamental and that the ODOC's regulation placed a substantial burden on Bradley's ability to exercise that right. Id. And, although the Court acknowledged the prison's "valid interest in the

_____

[14] In Turner, the Supreme Court found that a prison regulation that infringes upon a prisoner's constitutional rights is valid so long as it is "reasonably related to legitimate penological interests." See Turner, 482 U.S. at 79. Moreover, the Supreme Court outlined four factors to be considered when determining the reasonableness of a prison regulation. Those factors are: 1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; 2) whether there are alternative means of exercising the right that remain open to prison inmates; 3) the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and 4) the absence of ready alternatives or whether the rule at issue is an exaggerated response to prison concerns. Turner at 89-90.

peaceable operation of the prison through the insistence on respect," the Court found that the "link between this important purpose and the disrespect rules as applied to formal grievances is weak." Id. at 1281. In addition, the Court noted that the legitimate security concerns of the prison could be served in other ways. Id. Therefore, because the ODOC's security interests could be served in ways in which Bradley's constitutional rights would not be burdened, the Ninth Circuit found that the regulation was an exaggerated response, and therefore, invalid as applied to prison grievances which contain disrespectful language. Id. However, the Court left open "the possibility that there may be situations in which prison officials may properly discipline inmates for criminal threats contained in written grievances." Id. at 1280-1281.

In response to the Plaintiff's argument on this issue, the Defendants first assert that true threats are not protected speech under the First Amendment. See Motion to Dismiss (dckt. 30) at 3 (citing Fogel v. Grass Valley Police Dept., 415 F.Supp.2d 1084 (E.D.Cal. 2006)). This is true even if the speaker did not intend, or lacked the ability, to carry out the threat. Id. Moreover, the Defendants argue that the Court should defer to the knowledge and expertise of the Defendants as it relates to the Defendants perception that being put on notice in a correctional setting is a threat of violence. Second, the Defendants argue that Bradley is not controlling caselaw in this Circuit. However, even if it were, this case is distinguishable from Bradley in that it is not about mere disrespectful language, but rather, threats, the one area left open by the Bradley decision. The Defendants argue that they have a much more compelling interest in imposing sanctions for threats received in a grievance than the Oregon officials had for imposing sanctions for mere disrespectful language. The Defendants argue that the safety and security of the officers and inmates are paramount and that the defendants must take every precaution to stop any physical violence or threat

22

of physical violence before it occurs.  Moreover, the Defendants argue that Plaintiff was not punished for filing his written grievance, only for making a threat in a written grievance.

As noted by the Defendants in this action, although considered persuasive authority, Bradley is not controlling caselaw in this Circuit.  Moreover, even if it were, this case is clearly distinguishable from Bradley because the issue here is not one of disrespectful language, but one of threats, whether perceived or real.  Therefore, the analysis is not the same.

True threats are not constitutionally protected.  Watts v. United States, 394 U.S. 705, 707-708 (1969).  A true threat is an "expression of an intention to inflict evil, injury, or damage on another."  Planned Parenthood of Columbia/Willamette, Inc., v. Am. Coalition of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002).  The speaker of a true threat "need not actually intend to carry out the threat" because regulations prohibiting such threats are intended to "protect individuals from the fear of violence" and "from the disruption that fear engenders."  Virginia v. Black, 538 U.S. 343, 359-360 (2003).  "The only intent requirement for a true threat is that the [speaker] intentionally or knowingly communicate the threat."  Planned Parenthood, 290 F.3d at 1075.  Therefore, the question in this case turns on whether Plaintiff's statement that "This G-1 puts you on notice" is a true threat.

In cases in which there is a question as to whether or not a communication is a threat, the Fourth Circuit has held that "if there is substantial evidence tending to show beyond a reasonable doubt that an ordinary, reasonable recipient who is familiar with the context of letter would interpret it as a threat of injury, the court should submit the case to a jury."  United States v. Maisonet, 484 F.2d 1356, 1358 (4th Cir. 1973).  In other words, summary judgment should not be granted in this case unless the Defendants can offer substantial evidence that a reasonable corrections officer would have interpreted Plaintiff's notice as a threat of physical violence.  In making this determination, the

Court is obliged to consider the nature of the threat, the context in which it was made, and the reaction of the recipient. <u>Watts</u>, 394 U.S. at 706.

Here, the undisputed facts show that Plaintiff verbally complained to Defendants Miller and Robbins that he was afraid of his cell mate. When Plaintiff's verbal complaint yielded no response, Plaintiff filed a written grievance. In his written grievance Plaintiff states that he cannot live with his cell mate because they have irreconcilable differences and that their being confined together has the potential for violence. <u>See</u> Complaint (dckt. 1) at Ex. A. Plaintiff then requested that he and his cell mate be separated for their safety and that "This G-1 puts <u>you</u> on notice." <u>Id.</u> Based on their personal and professional experience, Defendants Robbins and Miller believed that being put on notice in a correctional facility was a threat of physical violence. <u>See</u> dckt. 62 at Ex. B and C (hereinafter Affidavit of Jay Robbins and Affidavit of Mike Miller). In fact, Officer Robbins had seen corrections officers put on notice by an inmate who then later assaulted the officer. <u>Affidavit of Jay Robbins</u> at 1. Thus, the Defendants felt threatened by the language in Plaintiff's grievance and as a result, Defendant Miller issued a violation report against Plaintiff for making threats. <u>See Affidavit of Jay Robbins</u> at 1 and <u>Affidavit of Mike Miller</u> at 1-2.

Based on the undisputed facts of this case, it was reasonable for Defendants Miller and Robbins to perceive Plaintiff's notice as a threat. In his written grievance, Plaintiff complained that violence could result if he and his cell mate were not separated. Plaintiff does not distinguish whether the violence would occur by his hand or that of his cell mate. Moreover, the Defendants experience as corrections officers led them to believe that being put on notice by an inmate was a threat of physical violence and their reaction was one of concern for their safety and that of Plaintiff and his cell mate. In addition, it should be noted that Plaintiff underlined the word you, leading an

objective reader to believe that Plaintiff was emphasizing in some way that Robbins and Miller were specifically being singled out. Therefore, viewing the report in its entirety, the undersigned believes that a reasonable officer in the same circumstances would have perceived the language in Plaintiff's written grievance as a threat of physical violence. Thus, the undersigned Magistrate Judge finds, beyond a reasonable doubt, that the language in Plaintiff's grievance is a true threat and is not protected speech under the First Amendment. That Plaintiff may not have intended for his notice to be a threat of violence against the Defendants or anyone else is simply irrelevant. Accordingly, ground three is recommended to be denied.

**D. <u>Ground Four</u>**

In this ground, Plaintiff asserts that the finding of guilt was erroneous and not supported by the facts. In support of this argument, Plaintiff asserts that at his disciplinary hearing, Defendant Miller testified that he witnessed a conversation between Plaintiff and Defendant Robbins in which Plaintiff stated that he feared violence between himself and his cell mate. However, Plaintiff asserts that Miller did not testify that Plaintiff told Robbins that he would resort to physical violence. In fact, Plaintiff argues that contrary to the violation report, the response to his grievance confirms that Plaintiff wanted to be moved for his own safety. Moreover, Plaintiff states that he testified at the disciplinary hearing that the phrase "This G-1 puts <u>you</u> on notice" was intended to merely be a warning to the Defendants that if he was hurt as a result of their failure to move him from his cell, they would be responsible in a court of law.

Prison disciplinary proceedings are not part of a criminal prosecution, therefore, the full panoply of rights that are due a defendant in a criminal proceeding do not apply in prison disciplinary proceedings. <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974) ("there must be mutual

accommodation between institutional needs and objectives and the provisions of the Constitution"). However, inmates are entitled to some due process protections. Id. Those protections include: written notice of the charges at least 24 hours before a hearing to enable the inmate to prepare a defense; to call witnesses and present documentary evidence if doing so is not an undue hazard to institutional safety, and a written explanation of the evidence relied on and reasons for disciplinary action. Id. On the other hand, an inmate does not have a right to confrontation and cross-examination, or a right to counsel. Id. at 567, 570. Disciplinary decisions comport with the requirements of procedural due process when there is "some evidence" to support the disciplinary decision by the fact finder. Superintendent, Mass. Corr. Institution v. Hill, 472 U.S. 445 (1985).

Here, Plaintiff does not argue that there was a procedural defect in his disciplinary proceedings which would violate his due process rights. Instead, Plaintiff merely argues that the findings of the hearing officer were erroneous and that the evidence was insufficient to find him guilty of the charge. To the extent that Petitioner argues that the findings of the hearing officer were erroneous, this Court does not have the authority to substitute its judgment for that of the hearing officer. Superintendent v. Hill, supra. Rather, as previously noted, this Court may only review whether or not there was "some evidence" to support the decision of the fact finder.

In connection with the finding of guilt, the hearing officer prepared a hearing report outlining his reasons for finding Plaintiff guilty of the charge. See the Complaint (dckt. 1) at Ex. D. In the Hearing Report, the hearing officer summarized the testimony as follows:

> U/M Miller testified he overheard the defendant talking to counselor Robbins and heard the defendant state he would resort to physical violence if the problem with his cell mate was not resolved. U/M Miller testified the defendant left the office and approximately five minutes later returned with a G-1 addressed to him. U/M Miller testified the G-1 stated that he (Miller) was put on notice. As a result of hearing the comment about the physical

violence Mr. Miller felt threatened by the defendant's statement and contents of the G-1. U/M Miller stated that he had to act by moving the defendant out of the cell based on the defendant's statement and contents of the G-1. U/M Miller stated he has reviewed the code and it does not state that an inmate must put someone on notice that they intend to file a document in court. U/M Miller stated the code only states they must exhaust all institutional procedures before filing to the court.

The defendant entered a not guilty plea and stated what he was doing was putting U/M Miller on notice that he intended to file documents in court and as part of the code he is required to put certain officials on notice. The defendant stated he did not intend for Mr. Miller to be threatened. The defendant requested CCI Robbins for a witness and the hearing was continued to secure his presence.

CCI Robbins testified that the defendant came into the office and presented himself in a threatening manner and then returned with a G-1. CCI Robbins stated the reasons the defendant used to be moved did not fit the criteria to be moved and he was denied. CCI Robbins stated he could not recall the defendant's exact words he used during their conversation since it had been so long ago. CCI Robbins stated his incident report was true and accurate but could not elaborate any further because he could not recall specific details. CCI Robbins stated that he was not sure who the defendant was referring to but he thought it was his cell mate.

Id.

Based on this testimony, the hearing officer found Plaintiff guilty of violating code 2.02 - threats, and sanctioned Plaintiff to 30 days punitive segregation (suspended), three months probation, and 30 days loss of all privileges. Accordingly, based on the testimony at the disciplinary hearing, and the actual contents of the grievance, the undersigned finds that there was clearly some evidence to support the guilty finding of the hearing officer. Thus, ground four is recommended to be denied.

**E.  Ground Five**

In ground five, Plaintiff argues that the finding of guilt violated his First and Fourteenth Amendment rights of access to the courts, free speech, and to seek redress. In support of this

ground, Plaintiff asserts that the language in his written grievance was protected speech under the First and Fourteenth Amendments and that he should not have punished.

This claim was addressed in ground three. In that ground, the undersigned determined that the language in Plaintiff's written grievance was a true threat and therefore was not protected speech under the First and Fourteenth Amendments. Accordingly, ground five is recommended to be denied.

## F. **Ground Six**

In ground six, Plaintiff asserts that the Defendants violated his First and Fourteenth Amendment right to freely practice is religion. In support of this claim, the Plaintiff asserts that he is of the Rastafarian faith and has taken the vow of the Nazarite. As such, the Defendants have violated his First and Fourteenth Amendment right to practice his religious beliefs by refusing to allow him to grow dreadlocks, failing to provide him with a religious diet, and/or failing to assist him in locating a Rastafarian leader and/or literature.[15]

### 1. Dreadlocks

On or about June 13, 2005, Plaintiff filed a grievance seeking permission to grow his hair long in compliance with his religious faith. In his grievance, Plaintiff argued that the WVDOC's grooming policy violates his rights under the First and Fourteenth Amendments of the United States Constitution and the RLUIPA. Plaintiffs' request was denied pursuant to WVDOC Policy Directive 334.01 (Inmate Grooming Standard).

On or about June 17, 2005, Plaintiff filed a grievance with Warden Haines seeking

---

[15] Other than making a general statement in his complaint that the Defendants failed to help him locate a Rastafari leader, Plaintiff does not develop this claim in any of his subsequent filings. Thus, the undersigned finds this claim insufficiently pled under Rule 8 of the Federal Rules of Civil Procedure and does not discuss this claim in more detail in this Opinion.

permission to grow his hair long in accordance with his religious beliefs. Plaintiffs' request was denied. Plaintiff appealed Warden Haines decision to Commissioner Rubenstein. Commissioner Rubenstein remanded the case back to Warden Haines for further consideration. Upon remand, Warden Haines determined that Plaintiff's request should be denied and filed a memorandum with Commissioner Rubenstein explaining his reasons for recommending denial. On August 1, 2005, Plaintiff filed a response to Warden Haines memorandum. On August 8, 2005, Commissioner Rubenstein denied Plaintiff request for exemption from WVDOC Policy Directive 334.01.

The WVDOC grooming policy states that the hair length of male inmates will not exceed the top of the collar or ears, be no more than three (3) inches on top and be kept neat and clean. See WVDOC Policy Directive 334.01. In addition, the grooming policy does not permit facial hair and each WVDOC facility is to establish its own operational procedures for the enforcement of grooming standards. Id. Plaintiff is incarcerated at Huttonsville Correctional Center. The grooming policy at Huttonsville Correctional Center expands the DOC's general grooming policy by requiring male inmates to shave their facial hair daily, limiting the length of sideburns, and forbidding certain hair styles such as, shaved heads, corn rows, plaits, Mohawks, designs, etc. See Motion to Dismiss (dckt. 30) at Ex. A. The failure to comply with the grooming policy subjects an inmate to disciplinary action, the loss of privileges, etc. Id. However, the policy allows medical exceptions so long as they are authorized by the staff physician and religious exceptions so long as they are authorized by the Warden. Id. In his complaint, Plaintiff argues that this policy substantially burdens the exercise of his religion in violation of the First and Fourteenth Amendments.

The First Amendment to the United States Constitution, made applicable to the States

through the Fourteenth Amendment,[16] provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." With regard to prisoners, the Supreme Court has noted that "[i]n the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives on the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Therefore, a prison policy "alleged to infringe constitutional rights [is] judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone v. Estate Shabazz, 482 U.S. 342, 349 (1987). However, the Court is required to give deference to the judgment of prison administrators in First Amendment challenges. Id at 350.

In Turner v. Safley, supra, the United States Supreme Court formulated a reasonableness test sensitive to both the need to protect the constitutional rights of inmates and the policy of judicial restraint regarding prisoner complaints. Specifically, the Court determined that when a prison regulation or policy "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. Therefore, although a prison regulation may infringe on an inmate's constitutional rights, that infringement is only actionable to the extent that the regulation is unreasonable. Id.

In articulating the Turner test, the Court identified several "factors that are relevant to, and that serve to channel, the reasonableness inquiry." Thornburgh v. Abbott, 490 U.S. 401, 414 (1989). The Turner factors are: (1) whether there is a "valid, rational connection" between the

---

[16] See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally;[17] and, (4) whether the regulation represents an "exaggerated response" to prison concerns. Turner at 89-91; Shaw v. Murphy, 534 U.S. 223, 229-30, (2001). Thus, the first step in considering a free exercise of religion claim, is to determine whether there has been an infringement in the first place. To do so, the Court must determine whether the Plaintiff is sincere in his asserted religious beliefs. If he is, and the regulation in question impinges upon his free exercise of religion, the second step is to determine whether the plaintiff has been "substantially burdened in his religious practice." See Turner, 482 U.S. at 89-91; O'Lone, 482 U.S. at 345.

With regard to Plaintiff's constitutional claims, the Court takes judicial notice of the Fourth Circuit's decision in Hines v. South Carolina Dept. of Corr., 148 F.3d 353, 357-358 (4th Cir. 1998). In Hines, the Fourth Circuit found that a grooming policy which requires all male inmates, regardless of their religious views or beliefs, to keep their hair short and their faces shaven in an effort to eliminate contraband, reduce gang activity, identify inmates, and maintain order, is a neutral policy and generally applicable regulation, therefore, it does not violate the Free Exercise Clause. Hines at 357-358. Moreover, the Court, assuming, without deciding, that such a policy infringes on an inmate's sincerely held religious beliefs, found that such a policy is reasonably related to

_____

[17] The Court must also consider the "ripple effect" of any accommodation. See Turner, 482 U.S. at 90 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.").

legitimate penological interests, such as maintaining order, discipline and safety.[18]  Thus, the Court

upheld that the South Carolina grooming policy in question.  Being that the South Carolina policy

in <u>Hines</u>, and the WVDOC policy in question in this case are substantially similar,[19]  Plaintiff's

constitutional claims as to the WVDOC's grooming policy are foreclosed by the Fourth Circuit's

decision in <u>Hines</u>.  Accordingly, this ground should be denied.

    2.  Religious Diet

    In his brief in support of religious diet, Plaintiff asserts that he requested that he be served

an "I-tal" vegetarian diet in conformance of his religious beliefs.  Plaintiff explains that an "I-tal"

diet consists of food grown organically without the use of pesticides or man-made chemicals.

Apparently recognizing that an "I-tal" diet was not possible in a correctional setting, Plaintiff

requested in the alternative that he be served a regular vegetarian diet.  Plaintiffs' request for a

religious vegetarian diet was granted.  However, Plaintiff complains that the vegetarian diet that he

was provided was nutritionally inadequate and made him ill.  As a result, Plaintiff requested that his

vegetarian diet be improved with a variety of fruits, grains and vegetables.  Plaintiff asserts that his

request was denied.  In addition, Plaintiff requested that his vegetarian diet consist of a variety of

entrees, instead of the peanut butter and beans he was served at every meal.  Plaintiff asserts that he

complained about the lack of entrees and was told that he would receive a variety of vegetable

---

[18] Like the SCDC, the WVDOC asserts that inmate grooming standards facilitate the prompt and accurate identification of inmates, facilitate inmate searches for weapons and contraband, promote good hygiene, and promote the safety and security of the facility.  <u>See</u> Affidavits of Defendants Haines, Miller and Robbins (dckt. 62) at Exs. A, B, and C.

[19] In <u>Hines</u>, the SCDC grooming policy required that all male inmates keep their hair short and their faces shaven.  <u>Hines</u>, 148 F.3d at 356.  Braids, plaits, mohawks and other extreme hairstyles were prohibited.  <u>Id.</u>  SCDC inmates were allowed to maintain neatly groomed mustaches, but beards were forbidden unless the inmate had a medical condition that would be aggravated by shaving.  <u>Id.</u>  The SCDC policy had no exceptions for religious reasons.

entrees. However, Plaintiff never received any additional entrees. Therefore, because his vegetarian diet was making him ill, Plaintiff requested to be taken off the same.

Plaintiff asserts that WVDOC Policy Directive 510.00 provides that "[r]eligious diets shall be provided, if possible, according to the mandates of the particular faith. Inmates shall be afforded reasonable and equitable opportunity to observe the religious dietary practice, with adherence to security constraints and the orderly running of the institution/facility/center." Plaintiff asserts that because he could not maintain an adequate diet with the vegetarian diet he was provided, the Court should issue an Order directing the Defendants to provide him a nutritious vegetarian diet.

In response to this claim, the Defendants argue that Plaintiff's request for an adequate vegetarian diet is now moot because Plaintiff's voluntary request to be removed from the vegetarian diet has been granted and Plaintiff is no longer entitled to such a diet. In addition, the Defendants assert that Plaintiff is not really arguing that the Defendant's failed to provide him with a vegetarian diet as requested. Clearly that is not the case. The Defendants argue that the Plaintiff is merely arguing that his food is bland because he does not have an adequate selection of entrees. The Defendants assert that bland food does not rise to the level of a constitutional violation. Moreover, the Defendants assert that Plaintiff's claim that the vegetarian diet is nutritionally inadequate lacks merit. In support of this claim, the Defendants assert that inmates on the vegetarian diet are informed that the core meals are not nutritionally adequate and that they must be supplemented with food from the self serve areas and with nutritional supplements. The self serve areas contain items such as oatmeal and vegetables, the very things Plaintiff complains are lacking from his diet. Therefore, any health effects Plaintiff may have suffered as a result of the vegetarian diet are of his own making because Plaintiff failed to supplement his meals with food from the self-serve area and

nutritional supplements.[20]

In the affidavit of Chaplain Brake, the contents of which Plaintiff has not disputed, the Chaplain confirms that Plaintiff was assigned a vegetarian diet as per his religious request. See dckt. 73, Ex. A at 1. The Chaplain also confirms that if Plaintiff had concerns about the nutritional adequacy of his diet, Plaintiff merely had to supplement his meals with foods from the self serve area and with dietary supplements available at the inmate store. Id. at 2. Moreover, the Chaplain notes that Plaintiff filed a request to be removed from the vegetarian diet and that request has been accommodated. Id.

Here, the undisputed facts show that Plaintiff was not denied a religious diet. Plaintiff requested that he be served an "I-tal" diet in conformance with his religious beliefs. By policy, the WVDOC is required to provide inmates a religious diet, but only to the extent that such an accommodation is possible. Apparently recognizing that an organic diet was not feasible in the corrections setting, Plaintiff requested as an alternative, a vegetarian diet for religious reasons. Plaintiffs' request was granted and Plaintiff was served a religious vegetarian diet. Furthermore, it is undisputed that inmates on a strictly vegetarian diet are warned that the core entrees are not nutritionally adequate and that the inmate is responsible for supplementing his entrees with foods from the self serve area and dietary supplements. Moreover, the foods that Plaintiff later requested

---

[20] The Defendants are skeptical as to Plaintiff's claims of health problems arising from his vegetarian diet. Similarly, the undersigned notes that although Plaintiff complains of weight loss, he can only show a weight loss of three pounds, from 139 pounds to 136 pounds. However, in his complaint, Plaintiff states that when he was having trouble with his cell mate in April of 2005, his weight was 130 pounds. Thus, it would appear that even though Plaintiff later lost three pounds, he still has had a net gain of six pounds during his incarceration. Thus, the effects of Plaintiff's diet do not appear to be detrimental to his health. In addition, Plaintiff asserts that he is showing signs of scurvy, yet the only symptom of scurvy to which he refers is weight loss. As already noted, however, the undersigned does not find Plaintiff's 3 pound weight loss indicative of poor health.

be added to his diet, whole grains, fruits and vegetables, were all available to Plaintiff, as they were

to all inmates, in the self-serve area. The Defendants cannot be faulted for Plaintiff's failure to

supplement his own nutritional needs. Accordingly, the Defendants have not violated Plaintiff's

First and Fourteenth Amendment rights with regard to a religious diet and this ground should be

denied.[21]

### 3. Religious Literature

In his brief in support of religious literature, Plaintiff asserts that he requested religious

literature of the Rastafarian faith be provided to him by the Defendants in accordance with WVDOC

Policy Directive 510.00, but was denied the same. Plaintiff asserts that with regard to religious

literature, Policy Directive 510.00 states that "[e]ach Warden/Administrator shall designate an

appropriate staff person as the Religious Services Coordinator who, along with the Chaplain, shall

follow the below guidelines.

> a. He/she/they shall provide, plan and coordinate the delivery of all aspects of the religious
> program.
> > (1) religious education
> > (7) self-taught study courses.
> b. Providing literature to inmates upon request."

Plaintiff concedes that the Policy does not state who is responsible for funding the cost of providing

religious literature, but that the Court should infer that the Defendants bare the cost because the

Plaintiff is indigent and dependant upon the Defendants for his religious needs. Plaintiff asserts that

he believes that the Defendants are appropriated thousands of dollars a year so they may provide

religious services to the inmate population. In addition, Plaintiff asserts that he believes that the

---

[21] In addition, to the extent that Plaintiff claims that he was served the same bland foods over and over again, the undersigned agrees with the Defendants that bland food does not rise to the level of constitutional violation.

Defendants purchase and provide religious literature to Christian and Muslim inmates upon request. Moreover, Plaintiff believes that the Defendants expend additional funds on other religious programs for inmates of those religions.

Contrary to what Plaintiff believes, Chaplain Brake states in his affidavit that the WVDOC does not use State funds to purchase religious materials for inmates. See dckt. 73, Ex. A at 1. Specifically, Chaplain Brake notes that Bibles are not provided to Christian inmates, Korans are not provided to Muslim inmates, and similar religious materials are not provided to inmates of other religions. Id. In addition, Chaplain Brake avers that Plaintiff has not been denied religious literature. Id. Indeed, Chaplain Brake notes that Plaintiff's request for the books in question was approved. Id. The Chaplain even contacted a book publisher and secured one of the requested books by donation. Id.

Based on the undisputed facts, Plaintiff has not been denied religious materials. Plaintiff merely complains because the WVDOC will not pay for the religious materials he has requested. However, the Policy Directive cited by the Plaintiff does not provide for the WVDOC to pay for religious materials for inmates and the Court will not infer such a responsibility. Moreover, the undisputed affidavit of Chaplain Brake establishes that the WVDOC does not provide similar materials to inmates of other faiths.[22] Instead, it appears that the DOC and its inmates are mostly dependent upon the kindness and generosity of the religious community and its volunteers. Therefore, Plaintiff has failed to show that he has been denied religious literature in violation of the First and Fourteenth Amendments and this ground should be denied.

----

[22] Plaintiff's claims that the WVDOC receives funds to pay for religious services and materials is nothing more than pure speculation on his part and does nothing to counter the affidavit provided by Chaplain Brake. The same can be said for Plaintiff's argument that he believes that the WVDOC provides religious materials and programs for inmates of other religions.

**G.  Ground Seven**

In ground seven, Plaintiff asserts that the Defendants grooming policy, failure to provide a religious diet, and failure to provide religious literature, violates the RLUIPA.

With respect to institutionalized persons, section 3 of the RLUIPA states that:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.

This section "covers state-run institutions -- mental hospitals, prisons, and the like -- in which the government exerts a degree of control unparalleled in civilian society and severely disabling to private religious exercise.  RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 720-721 (2005) (internal citations omitted).

1.  Religious Diet and Religious Literature

In ground six, the undersigned determined that Plaintiff had failed to state sufficient facts to sustain his claim that he was denied a religious diet or his claim that he was denied religious literature. In fact, based on the undisputed facts, the undersigned found just the opposite.  Because Plaintiff was not denied a religious diet or religious literature, the undersigned then addressed Plaintiff's additional claims based on the quality of the food provided in his religious diet and who

should pay for the religious literature Plaintiff submitted for approval. Again, however, based on the undisputed facts, the undersigned found that those claims were without merit and/or failed to rise to the level of a constitutional violation.

As set forth above, in order to sustain a claim the RLUIPA, Plaintiff must show that the failure of the WVDOC to provide him a religious diet and religious literature imposed a substantial burden on the exercise of his religion. Because Plaintiff cannot show that he was denied these items, he cannot show that the exercise of his religion was burdened, let alone that it was substantially burdened. Accordingly, these claims should be denied.

2.  Grooming Policy

Assuming, without deciding, that the grooming policy of the WVDOC places a substantial burden on Plaintiff's exercise of his religion, the only questions that remain are whether the policy is in furtherance of a compelling governmental interest and whether it is the least restrictive means of furthering that compelling governmental interest.

In their affidavits in support of the motion to dismiss, Defendants Haines, Robbins, and Miller assert that the grooming policy of the WVDOC serves several compelling interests. Those interests are: 1) to facilitate the prompt and accurate identification of inmates; 2) to facilitate inmate searches for weapons and contraband; 3) to promote good hygiene; and 4) to promote the safety and security of the facility. See Affidavits of Defendants Haines, Miller and Robbins (dckt. 62) at Exs. A, B, and C. In Hines v. South Carolina, 148 F.3d at 358, the Fourth Circuit Court of Appeals found that concerns of maintaining order, discipline and safety are compelling reasons for upholding a grooming policy in a state penological facility. See also Cutter v. Wilkinson, supra. Accordingly, the undersigned finds that the Defendants have established that their grooming policy is in

furtherance of a compelling governmental interest.[23]

With regard to the less restrictive means prong, several courts have addressed whether prison grooming policies, even those that include the forced cutting of hair, meet the "least restrictive means" criteria of the RLUIPA, and its predecessor, the Religious Freedom Restoration Act ("RFRA"). Upon a review of those cases, it is clear that they do. See Daker v. Washington, ____ F. Supp.2d ____, 2007 WL 92502 (N.D.Ga. Jan. 16, 2007) (shaving policy is least restrictive means and does not violate RLUIPA); Clark v. Briley, 2005 WL 2369330 at *5 (N.D.Ill. Sept. 26, 2005) (finding that forcing an inmate to submit to a haircut was the least restrictive means of meeting the prison's safety and security concerns); Hoevenaar v. Lazaroff, 422 F.3d 366 (6th Cir. 2005) (the district court must give substantial deference to a prison official's opinion that a grooming policy is the least restrictive means necessary to promote prison safety and security); Brunskill v. Boyd, 141 Fed.Appx. 771, 776 (11th Cir. 2005) (hair length policies are the least restrictive means of furthering compelling governmental interests in security, health and safety of inmates and staff); Diaz v. Collins, 114 F.3d 69, 73 (5th Cir. 1997) (compelling interests of safety and security could not be achieved without some sort of regulation limiting hair length); Hamilton v. Schiro, 74 F.3d 1545, 1555 (8th Cir. 1996) (hair length regulations serve compelling interests in safety and security and there is no viable, less restrictive means of addressing those concerns).

Like the other cases to address this issue, the undersigned finds that the defendants in this case have established that the WVDOC's grooming policy serves compelling interests in safety and security. As already noted several times throughout this Opinion, the Defendants assert that the

---

[23] The Court will not substitute its judgment for that of a seasoned prison official on what constitutes a prison security risk. See Procunier v. Martinez, 416 U.S. 396, 404-405 (1974). The Court must, instead, review the facts and give deference to the Defendants' expertise when it is due. Id.

WVDOC policy serves the compelling interest of safety and security by facilitating the prompt and accurate identification of inmates, facilitating inmate searches for weapons and contraband, and by promoting good hygiene. See Affidavits of Defendants Haines, Miller and Robbins (dckt. 62) at Exs. A, B, and C. Moreover, as found by other courts, the undersigned is of the opinion that the WVDOC's grooming policy is the least less restrictive means of addressing those concerns.[24] Accordingly, Plaintiff has failed to state claim for relief under the RLUIPA and ground seven should be denied.

## IV. Recommendation

Because the Defendants motion to dismiss is supported by affidavits and other documents, the undersigned recommends that the motion to dismiss be construed as motion for summary judgment. Moreover, for the reasons set forth in this Opinion, the undersigned recommends that the Defendants construed Motion for Summary Judgment (dckt. 30) be GRANTED and the complaint be DENIED and DISMISSED with prejudice.

Within ten (10) days after being served with a copy of this opinion/report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A

---

[24] Although Plaintiff states in his complaint that there are several less restrictive ways to address the Defendants safety and security concerns with regard to hair length, Plaintiff fails to actually set forth any viable alternatives. In addition, Plaintiff argues that other correctional authorities, including the West Virginia Regional Jail Authority and the Bureau of Prisons, are able to safely operate despite not having grooming policies. Plaintiff appears to believe that the lack of a grooming policy in other institutions is sufficient to show that grooming policies are not necessary to maintain safety and security in the WVDOC. The undersigned, however, remains unpersuaded by this argument. See Daker, 2007 WL 92502 at *7 (citing Hill v. Blackwell, 774 F.2d 338, 244-45 (8th Cir. 1985) ("Although the policy of other institutions [may be] relevant in determining the need for a particular regulation, it is clearly not dispositive . . . [A]lthough federal institutions and approximately one-half of the states [] do not enforce a beard regulation," the other half of the states do.).

copy of any objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert.</u> denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Opinion/Report and Recommendation to the *pro se* plaintiff and counsel of record.

DATED: February 13, 2007

/s *John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE